### SLAWSON v. UNITED STATES.

Under the proviso to the first section of the Abandoned and Captured Property Act, excluding from its benefits property which "has been used in waging or carrying on war against the United States," the Court of Claims was held to have rightly dismissed a petition asking for the proceeds of a vessel which had been so used at Charleston, S. C, though on the evacuation of that place by the rebels, the quartermaster's department of the navy, in ignorance of how the boat had been used, chartered her and took her into the service of the government, and kept her in such service for twelve months, when disregarding the claims of her owner it turned her over to the Treasury Department for sale as captured property.

APPEAL from the Court of Claims; the case being thus:

An act of Congress, passed March 12th, 1863, and known as the "Captured and Abandoned Property Act," enacted that the Secretary of the Treasury might appoint agents to receive and collect all abandoned or captured property in any State engaged in the late rebellion. Such property the act directed to be sold, and the proceeds to be paid into the Treasury; and any person professing to be the owner, on certain conditions prescribed, was authorized to prefer his

claim to the Court of Claims, and on proof of his ownership, loyalty, &c., to recover the net proceeds of the sale. The act, however, by a *proviso* to its first section, expressly enacts that the property included within the act,

"Shall not include any kind or description which has been used or which was intended to be used for waging or carrying on war against the United States, such as arms, ordnance, ships, steamboats, or other water craft."

With this act in force, one Slawson preferred his petition to the Court of Claims, claiming the proceeds of the steamer "De Kalb," which had been taken and sold as abandoned property under this act, in the following circumstances:

In April, 1861, before the bombardment of Fort Sumter, the Confederate authorities at Charleston took forcible possession of a steamer owned at that time by one Dingle, and then in the possession of Slawson, who had charge of her—he objecting to her being taken into the rebel service—and used her for military purposes, under a charter, until the evacuation of Charleston, in February, 1865. During the continuance of this employment, and while she was under the charter, Dingle died, and in April, 1863, the boat was sold at administrator's sale to Slawson, who, either as agent of the owner, or as owner himself, had the management of her from the beginning of the rebellion to the evacuation of Charleston. On the morning that this event took place, the boat, while lying at the wharf, was set on fire by soldiers and turned adrift in the harbor. In this condition she was boarded by Slawson and the fire put out, but she drifted ashore on James Island, opposite Charleston, where she was when the United States forces took possession of the city.

On the occasion of this occupation, one Tower, an engineer in the navy, was placed in charge of the captured vessels and transport services. In a conversation between him and Slawson his attention was called to the steamer, and after making inquiries as to her condition, he directed Slawson to bring her to Charleston, and agreed to place her in

the service of the United States. Accordingly, with the consent of Captain Moore, of the quartermaster's department, he fixed $150 per day as the compensation for her use. Neither this sum nor any other was ever paid for this use, nor would the quartermaster's department give up the vessel to Slawson again, though he asked to have her. The steamer remained in the service of the government until April, 1866. Then, without notice to Slawson, and against his will, under an order from the quartermaster-general's office—directing that vessels captured at Charleston should, when not required by the quartermaster's department, be turned over to the agents of the treasury—she was turned over to the agents of the treasury accordingly. Slawson then applied to the Secretary of the Treasury for the return of the boat, but the secretary replied, that, " in view of the facts, if the property had been seized by a treasury agent, or had not come into the possession of his department by transfer from the military authorities as captured, it might be within the scope of his authority as secretary to decide that the United States had no rightful claim to the boat, and to restore her. But that by the act of transfer to the Treasury Department, the military power had adjudged and determined the fact, that the boat was the lawful capture or prize of the army, and that it was not within his power to revise that decision."

The boat was accordingly sold, and the proceeds paid into the treasury.

Slawson now petitioned that court for their net amount. The court dismissed his petition on the ground of its restricted jurisdiction; and referred to the above-quoted proviso as to property which had been " used for waging or carrying on war against the United States." From this decree of dismissal Slawson appealed.

*Mr. George Taylor, for the appellant; Mr. C. H. Hill, Assistant Attorney-General, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

It is impossible to suppose that Tower would have made

the contract he did with Slawson if he had been informed of the true state of affairs with reference to this steamer, and in the absence of proof on the subject it is a fair presumption that he was kept purposely in ignorance of the fact that she had been engaged constantly for nearly two years preceding the occupation of Charleston by the Federal forces, with the consent of the owner, in carrying on war against the United States. The object of Slawson in the transaction was obvious. If he could, through the instrumentality of Tower, get his steamer in the service of the government at a stated compensation, he would have a chance at least to save her from being treated as prize of war, and, if so, to obtain a remunerative price for her future employment. The circumstances at the time were favorable to the accomplishment of his object. The steamer was aground on a distant island, and Tower, although he had a right to suspect, could not certainly know the kind of use to which she had been previously put. If a credulous man, which would seem to be the case, he could be easily imposed on, and in the nature of things it was not to be expected that any one would volunteer information to condemn the boat and Slawson's conduct in connection with her.

It seems, however, that the mode adopted by Slawson to save his boat, and obtain compensation for her future use, if ingeniously contrived, did not accomplish his object, for the government not only declined to pay anything for her use, but appropriated the boat itself as the lawful capture of the army. This disposition of the property was strenuously resisted by Slawson. The quartermaster's department not only refused on request to return the boat, but without notice to Slawson, and against his will, turned it over to the agent of the treasury. Learning that this was done, he invoked, without success, the authority of the Secretary of the Treasury in his behalf. This officer declined to restore the boat, on the ground that by the act of transfer to the Treasury Department the military power had adjudged and determined the fact that the boat was the lawful capture or prize of the army, and that he had not the power to revise

that decision. She was accordingly sold, and the net proceeds paid into the treasury. Slawson insists that he is entitled to these proceeds under the act to provide for the collection of abandoned property, even if there had been a valid capture, but the proviso to the first section of this act expressly excludes from its operation property which, like this, has been used for the purpose of carrying on war against the United States. Congress did not think proper to become the trustee for the owner of a steamboat engaged, with his consent, in the military service of the enemy at the very time Charleston was taken. It will not do to say that Slawson acted under compulsion after his purchase. In the first place the Court of Claims do not find this to be the case, and, besides, his conduct is inconsistent with any such theory, for he purchased the steamer while under charter in the Confederate service, and necessarily must have known that he could not recover her from that service. It needs no argument to show that the purchaser under such circumstances, consents that the boat shall be continued in the same business in which she had been engaged from the commencement of the rebellion. The claimant is, therefore, excluded from the benefit of the Captured and Abandoned Property Act, and as the Court of Claims has no jurisdiction to try a case growing out of the appropriation of property by the army or navy, it follows that its judgment must be

AFFIRMED.